UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | Crim No. 10-10133-WGY |
| v. ) | |
| ) | |
| TREVOR A. WATSON, ) | |
| ) | |
| Defendant. ) | |

GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by undersigned counsel, submits this Sentencing Memorandum in advance of the March 10, 2011 sentencing of Defendant Trevor A. Watson (hereinafter, "defendant"). For the reasons set forth below, including the premeditated and vicious nature of this offense, defendant's lifelong history of violence and contempt for the rule of law, the need to protect the public from defendant's future crimes, and the importance of sending a strong message that attempts to kill and silence federal witnesses will be met with the harshest consequences, the government recommends a sentence of thirty years' imprisonment.

I.   FACTS

On December 2, 2010, a federal jury found defendant guilty of "the charge of witness tampering by attempting to kill [the victim]," an active U.S. Drug Enforcement Administration ("DEA") informant, in violation of 18 U.S.C. § 1512(a)(1)(A) and (C).  See

1

ECF Dkt. No. 55.[1]  The evidence at trial established that on the afternoon of February 27, 2010, at Ann's Unisex Barbershop on Tremont Street in the South End of Boston (hereinafter, the "Barbershop"), defendant stabbed a DEA informant over ten times, lacerating his intestine, damaging his bowel and colon, and sending the victim to Boston Medical Center for emergency surgery.  While stabbing him, defendant said to the victim, "you talking, huh, you telling."  The evidence at trial also established that, prior to February 27, 2010, the DEA informant had provided DEA with information regarding defendant's involvement in a federal cocaine conspiracy.[2]

II.  GUIDELINES CALCULATION

The government has no objections to the Presentence Report ("PSR") and believes that the U.S. Probation Office has accurately calculated defendant's advisory guideline sentencing range of 360 months - life.  As the PSR indicates, however, defendant cannot be sentenced to more than 360 months, as that is the statutory maximum.  See 18 U.S.C. § 1512(a)(3)(B)(i).

---

[1]  A previous trial of defendant on the same charges resulted in a hung jury on November 5, 2010.  See ECF, United States v. Watson, 10-10133-WGY, November 5, 2010, Electronic Clerk's Notes, stating, "the Court declares a mistrial and the jury is adjourned."

[2]  The government also introduced substantial additional motive and other evidence at trial, but because the Court has twice presided over trial of this matter, the government does not include herein a more detailed summary of the facts of the case.

A.   Pursuant to USSG § 2A2.1, Assault with Intent to Commit Murder, Defendant's Base Offense Level is 33

The Court should calculate defendant's base offense level as 33 because: (1) USSG § 2A2.1 applies to violations of 18 U.S.C. § 1512(a)(1)(A) & (C), see USSG Appendix A, Statutory Index, at page 552; (2) as discussed below, the object of defendant's offense would have constituted first-degree murder if the victim had died, see USSG § 2A2.1(a)(1); and (3) the jury explicitly found that defendant attempted to kill his victim.

In his objections to the PSR, Defendant contends that USSG § 2A2.1(a)(2) should apply instead, resulting in a Base Offense Level of 27, because defendant's attempt to murder the victim was not premeditated. See Defendant's February 16, 2011, Objections to the PSR regarding Paragraph 30. Such a claim, however, is in stark contrast to the evidence at trial, which was that on February 27, 2010, defendant asked his friend Jonathan Ace to make a detour to the victim's location, whereupon defendant approached, isolated, and brutally stabbed him at least ten times.

Application Note 1 to USSG § 2A2.1 defines first-degree murder for USSG purposes as conduct that would constitute first-degree murder under 18 U.S.C. § 1111. First-degree murder is defined in 18 U.S.C. § 1111 as the "unlawful killing of a human being with malice aforethought." See 18 U.S.C. § 1111(a). Section 1111(a) further states that, "every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and

3

premeditated killing ... or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree." See id.

Defendant's planned ambush of a DEA informant on February 27, 2010 plainly would have constituted first-degree murder if the victim had died. Defendant's friend Jonathan Ace testified that on February 27, 2010, he was with defendant, having previously agreed to assist him in acquiring an American Bandogge Master dog. See 10/28/2010 Tr. at 18.[3] Ace further testified that when he picked up defendant in Dorchester that day, rather than going directly to Somerville to get the dog as Ace had expected, defendant told Ace he had to make a stop at the Barbershop. See id. at 18-19. Upon arrival at the Barbershop, the evidence was that defendant approached and then spoke with the victim, eventually saying to the victim, "let me holler at you, Bro," see id. at 14, which the victim testified meant that defendant wanted to speak with him privately. After some time, defendant and the victim walked away from Ace and the other individual outside of the Barbershop, Al

---

[3] The citations herein are to the trial transcripts from the first trial of defendant, as the government does not have transcripts from the second trial. To the best of the government's knowledge, the testimony cited herein is materially indistinguishable from the testimony provided in the second trial. In addition, the government does not have trial transcripts with respect to witnesses Detective Kelleher, Ann Jackson, and Dr. Abbensetts, so it does not include herein precise citations to their testimony.

Rue.  Only <u>after</u> walking away from the front of the Barbershop with the victim did defendant stab him repeatedly while stating, "you talking, huh, you telling," puncture his organs, then flee the scene, leaving his bloody victim for dead.

In short, defendant's re-direction of his friend Jonathan Ace from Somerville to the Barbershop, combined with defendant's initiation, separation, and attack of his victim once at the Barbershop, clearly demonstrated that his stabbing of the victim occurred with malice aforethought.  Accordingly, pursuant to USSG § 2A2.1(a)(1), the base offense level should be 33.

        B.    <u>Pursuant to USSG § 2A2.1(b)(1)(A), Defendant's Offense Level Should be Increased by Four Levels Because the Victim Sustained Life-Threatening Injuries</u>

Pursuant to USSG § 2A2.1(b)(1)(A), defendant's base offense level should be increased by four levels because the victim sustained life-threatening bodily injuries.  According to application note 1(J) of USSG § 1B1.1, "'[p]ermanent or life-threatening bodily injury' means injury involving a substantial risk of death; loss or substantial impairment of the function of a bodily member, organ, or mental faculty that is likely to be permanent; or an obvious disfigurement that is likely to be permanent."

That the injuries defendant inflicted on the DEA informant victim were life-threatening is undeniable.  In addition to, among other things, the victim's own testimony regarding his injuries,

5

the government introduced the following evidence at trial regarding the nature and extent of the victim's injuries: (1) the testimony of witness Al Rue, who drove the victim to Boston Medical Center on February 27, 2010 and testified that he observed blood coming from the victim's "puncture wounds," that Rue himself was in "shock," and "thought any minute [the victim] was going to pass out," see 10/28/10 Tr. at 15; (2) the victim's bloody and slashed clothing, which Boston Police Department Detective John Kelleher testified was consistent with knife holes; (3) photographs of the interior of Rue's blood-soaked Mercedes taken at Boston Medical Center after Rue had transported the victim there on February 27; (4) graphic photographs of the victim's torso and arms taken shortly after his life-threatening injuries had been repaired by emergency surgery; and (5) the testimony of Dr. Kofi Abbensetts, the trauma surgeon who operated on the victim on February 27, 2010, who testified that the victim had approximately ten separate entry wounds consistent with being stabbed, that those wounds included damage to his internal organs and fluid in his pelvis, and that the victim required multiple hours of emergency surgery in order to stabilize his condition.

While there is limited authority in the First Circuit on the interpretation of "permanent or life threatening bodily injury," the First Circuit has, in an unpublished opinion, upheld a district court's determination that serious psychological trauma resulting

from a carjacking was "serious bodily injury," and noted that because the victim "will suffer a lifetime of mental illness," the district court would have been justified in finding that a more severe "permanent or life threatening bodily injury" enhancement applied. United States v. Ramirez-Burgos, 114 F.3d 1170, *7 (1st Cir. 1997) (unpublished disposition). Additionally, the Ninth Circuit held that a district court may apply an enhancement for permanent bodily injury "without making specific findings as to the permanency of [the victim's] injury," at least where the defendant does "not present to the district court any evidence calling into question the nature of [the] injuries." United States v. Ziska, 2010 WL 5423717, *2 (9th Cir. 2010); see also United States v. Price, 149 F.3d 352, 354 (5th Cir. 1998) (upholding a finding of § 1B1.1 permanent injury based on 15 to 25 percent loss of function in left hand).

Here, the evidence at trial overwhelmingly established that the victim's injuries were life-threatening – he was viciously stabbed over ten times in broad daylight, bled profusely, had substantial internal organ damage, and needed emergency surgery. Indeed, it is hard to conceive of injuries that would qualify as life-threatening if these did not.

C.    Pursuant to USSG § 3C1.1, Defendant's Offense Level Should be Increased by Two Levels Because Defendant Obstructed Justice

Defendant's offense level should be increased an additional

two levels pursuant to USSG § 3C1.1 because the evidence at trial was that defendant repeatedly attempted to further obstruct justice in this case even after he was arrested and charged.

USSG § 3C1.1 provides for a two-level increase if: (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction; and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense. See USSG § 3C1.1.

As the Court is no doubt aware, once detained on this matter, defendant wrote letters and made phone calls from jail to his associates in a brazen attempt to suborn perjury and stifle the truth. It was clear from the letters and recorded phone calls that defendant was trying to get his associates to contact witnesses to the stabbing in the hopes of procuring bogus exculpatory testimony. Defendant also asked those same associates to appear in court if and when the victim testified against defendant in what, in light of defendant's involvement in the Paul Pierce stabbing, could only be construed as an attempt to intimidate the victim.[4]

The government introduced some of defendant's jail letters at

_____

[4] On this score, defendant appeared to be at least partially successful, as a number of individuals associated with defendant were present in the courtroom throughout both trials, including during the victim's testimony.

8

trial, including one in which defendant told acquaintance Keith McCarthy, "[t]he Paul Pierce case was the same way, but at trial, he changed his statements, and I got found not guilty of attempted murder ... I need the victim to let those people know that it was a Spanish unknown person, around 30 in a [sic] affidavit..."

In addition to the letter to McCarthy, the following document, which was seized from defendant's cell in Plymouth County Correctional Facility on or about April 2, 2010, was introduced at trial:

> 1) Have the Barber, TrueC, Bum, or someone have him sign an affidavit saying it's a 30 year old Spanish guy.
>
> 2) I had no knowledge of the Camacho case and no contact with anyone involved.
>
> 3) Shara can put 10 witnesses at the scene saying it was a 30 year old Spanish guy.
>
> 4) Please have the victim ... in court on the stand with my barber present, True C, Bum, Fred, Keith, and host of others ... "

After introducing the above letters at trial, the government also played an excerpt of a recorded call defendant made from jail in which he told his girlfriend to tell his lawyer to get a private investigator to get to the victim and have the victim "do an affidavit saying it was the wrong guy," i.e., not defendant.

That defendant was ultimately unsuccessful in getting people to lie for him was likely due only to the fact that DEA and the Plymouth County Sheriff's Department were able to obtain the letters and calls before defendant could succeed. Even still, the

testimony of government witness Ann Jackson, the owner of the Barbershop and Boston Public School crossing guard, who was present at the scene of the stabbing on February 27, 2010 and who identified defendant as the perpetrator to Boston Police on February 27, 2010, was inconsistent with her initial statements to police, inconsistent from the first trial of this matter to the second, and even internally inconsistent with itself. As one example, at the first trial of this matter, Jackson testified that she saw a black male with blood outside the Barbershop on February 27; she then either denied or did not remember this fact when she testified at the second trial.

The inconsistencies and contradictions in Jackson's testimony are best explained by her own fear. As Detective Kelleher and DEA Special Agent Dennis Barton testified, when they met with Jackson, she was nervous, scared and frightened, and as Jackson herself testified in response to questions regarding her state of mind, in sum and substance, "kids these days will just shoot you." The government argued at closing that Jackson's fear was well-founded, especially in light of the above-referenced letter to McCarthy, in which defendant also directed McCarthy to find out if "Ann" made a statement that was "helpful" to him or not. Of course, defendant did not implore McCarthy to seek the truth, or confirm that Jackson would testify consistent with her actual memory of events.

In sum, there is no plausible interpretation of the jail

letters and calls other than that defendant was making every effort to beat the system and obstruct justice through bullying, intimidation, and attempted perjury. Accordingly, defendant's offense level should be increased by two levels pursuant to USSG § 3C1.1.

D. Standard for Finding Enhancements

The court must of course find the facts necessary to impose the life-threatening injury and obstruction enhancements only by a preponderance of the evidence. United States v. Dyer, 589 F.3d 520, 524 (1st Cir. 2009) ("[T]he government must prove facts essential to sentencing enhancements by a preponderance of the evidence."); see also United States v. Olivero, 552 F.3d 34, 40 n.3 (1st Cir. 2009)(jury verdict does not determine drug quantity for guideline purposes). See generally United States v. Guzman, 603 F.3d 99, 111 (1st Cir. 2010)("We reject Guzman's contention that the district court's factfinding to determine 2A1.1 to be the proper guideline violated the rule of Apprendi v. New Jersey. 'A sentencing court may make factual findings that result in an increase to a defendant's sentence as long as the sentence imposed is within the default statutory maximum.'" (quoting United States v. Vasco, 564 F.3d 12, 23 (1st Cir. 2009)) (citation omitted)).

III. 18 U.S.C. § 3553 ANALYSIS

A sentence of thirty years' incarceration is the minimum sentence sufficient to satisfy the purposes set forth in 18 U.S.C.

11

§ 3553.

A. <u>18 U.S.C. § 3553(a)(1) - Nature and Circumstances of Offense and Defendant's History</u>

Defendant is a very dangerous man.  In addition to the savagery, defendant has shown repeated contempt for the integrity of the criminal justice system.  Indeed, the facts of this case - stabbing and leaving for dead a DEA informant while saying, "you talking, huh, you telling" - perfectly embody defendant's long history of violent and subversive behavior.

Defendant's conduct in this case is also no anomaly.  In 1986, defendant was sentenced to twenty years' incarceration (the entire sentence appears to have been suspended) for armed robbery.  According to the PSR, the charges in that case involved an incident in Roxbury, Massachusetts in which defendant and four other males approached their victim, beat him, pulled a gun, fired two shots, and robbed the victim.  <u>See</u> PSR at ¶ 42.

In 1993, defendant was sentenced to 64 months' incarceration in this District by Judge Woodlock for being a felon in possession of a firearm.  According to the PSR, that case stemmed from an incident on July 9, 1993, in which a 17-year-old male was struck on the left side of his head with a firearm, causing the firearm to discharge.  The bullet was later found in the exterior wall of a nearby building.  When an officer responding to the scene saw defendant and another individual and ordered defendant to stop, defendant fled.  Officers later located a firearm nearby in a small

12

garden.  Defendant also twice violated his supervised release bfore

Judge Woodlock.  See id. at ¶ 44.

As the Court is aware from a motion in limine the government

filed before trial, while incarcerated on the felon-in-possession

federal case at FCI Ray Brook, on May 3, 1996, defendant and two

fellow inmates assaulted a third inmate who had allegedly accused

one of defendant's friends with cooperating with law enforcement.

In response to the victim's accusation, defendant and two other

inmates assaulted the victim, holding him from behind, cutting his

face and head with a razor blade, and striking him with a dumbbell

from the Ray Brook weight room.  The victim required forty-five

stitches to close the wounds.  See ECF Dkt. No. 37-1, FCI Ray Brook

Incident Report.

Defendant was also one of three individuals charged with the

vicious attack on Boston Celtic Paul Pierce at the Buzz Club in

2000.  On September 25, 2000, Pierce was stabbed eleven times in

the face, neck, and back.  Though charged with attempted murder,

after multiple witnesses changed their trial testimony under

suspicious circumstances to benefit defendant, defendant (who

compared the current case to the Pierce case in his jail letters)

was acquitted of the most serious charges and convicted only of

misdemeanor battery.

Finally, it should be noted that juxtaposed against

defendant's pattern of wanton violence and disregard for the law

13

are virtually no mitigating factors.[5]

> B.  18 U.S.C. § 3553(a)(2)(A), (B), and (C) - Need to Promote Respect For Rule of Law, Afford Adequate Deterrence, and Protect Public From Defendant's Future Violence

The only way to protect the public from Trevor Watson is to remove him from the public for as long as possible. Further, as defendant has been breaking the law and beating the system for most of his life (primarily by attacking and intimidating others), the best way — in fact, the only way — to now promote respect for the rule of law is to sentence defendant to the statutory maximum period of incarceration. Finally, in accordance with 18 U.S.C. § 3553(a)(2)(B), this Court should send a strong message not only to defendant, but to the general public and community at large, that acts of violence against government witnesses, and efforts to silence "rats," and "snitches," are totally unacceptable in a free society, and will be met with the law's most severe consequences.

_____

[5]  According to the PSR, defendant is the father of eight children, ages 3, 12, 16, 17, 20, 23, 23, and 25, by seven different women. See PSR at ¶¶ 74-89. Additionally, according to defendant, his upbringing was "great," and he did not experience any form of abuse, witness any substance abuse within his home, nor suffer any financial hardships while he was growing up. See id., at ¶¶ 65-66.

IV.  CONCLUSION

For the reasons set forth above, the government respectfully requests that the Court sentence defendant to a term of imprisonment of thirty years, or 360 months.

Respectfully submitted,

CARMEN M. ORTIZ
UNITED STATES ATTORNEY

By:  /s/ Zachary R. Hafer
Zachary R. Hafer
George W. Vien
Assistant U.S. Attorneys
Boston, MA 02210

Date:    March 3, 2011

## CERTIFICATE OF SERVICE

      I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified in the Notice of Electronic Filing.


                                 */s/ Zachary R. Hafer*
                                   Zachary R. Hafer
                                   Assistant U.S. Attorney

Dated: March 3, 2011